**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

LOUIS EDWARD PLATT,

                 Plaintiff,

vs.                                Case No. 3:07-cv-1153-J-JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                 Defendant.
_____/

## OPINION AND ORDER[1]

### I. Status

Louis Edward Platt ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for benefits under the Social Security Act. Plaintiff applied for disability insurance benefits and supplemental security income on June 24, 2005. Transcript of Administrative Proceedings ("Tr.") at 49. After holding a hearing on June 5, 2007, the Administrative Law Judge ("ALJ") issued a decision finding Plaintiff was not disabled through the date of the decision. Tr. at 12-24. The Appeals Council denied review on November 14, 2007. Tr. at 2-4. On December 6, 2007, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing the Complaint (Doc. No. 1) seeking review of the Commissioner's final decision. Plaintiff has exhausted the available administrative remedies, and the case is properly before the Court. Plaintiff raises three issues: (1) whether the ALJ correctly evaluated Plaintiff's treating physicians' medical opinions; (2) whether the

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge, <u>see</u> Consent to the Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 13), and the Order of Reference was entered on March 25, 2008 (Doc. No. 14).

ALJ correctly determined Plaintiff's residual functional capacity; and (3) whether the ALJ correctly assigned the burden of proof at the fifth step of the sequential evaluation process. See Memorandum in Support of Complaint (Doc. No. 15; "Plaintiff's Memorandum") at 6-8. For the reasons explained herein, the undersigned concludes that the ALJ properly weighed the medical opinions of Plaintiff's treating physicians; the ALJ properly determined Plaintiff's residual functional capacity; and the ALJ correctly assigned the burden of proof at the fifth step of the sequential evaluation process. Therefore, the decision of the ALJ is due to be affirmed.

## II. Background

Plaintiff worked as a BellSouth telephone services technician for thirty-two years. Tr. at 65, 105, 317.[2] He alleges disability beginning June 1, 2005 due to pain in his right shoulder and both knees.[3] Tr. at 49, 96, 317-19; Plaintiff's Memorandum at 2. Although the ALJ found Plaintiff had acquired sufficient quarters of coverage to remain insured through December 31, 2010, she concluded Plaintiff had not been disabled within the meaning of the Social Security Act since June of 2005. Tr. at 12.

### A. Relevant Medical History

#### 1. Plaintiff's Shoulder

Plaintiff's relevant medical records reveal a history of shoulder and knee pain. On June 6, 2002, Plaintiff complained to Dr. Kent Braeutigam of bilateral shoulder pain. Tr. at

---

[2] Plaintiff was fifty-four years old when the hearing was held before the ALJ on June 5, 2007. Tr. at 315.

[3] Plaintiff stopped performing his regular work duties in November of 2004. Tr. at 315. He was thereafter assigned to light duty through June of 2005. Tr. at 316. Plaintiff used annual leave from June 1, 2005 through July 5, 2005. Tr. at 69, 73.

138.  Dr. Braeutigam had been Plaintiff's primary care physician since 1996 and treated Plaintiff for a variety of routine medical problems.  Tr. at 121-50; Plaintiff's Memorandum at 3.  X-ray images were taken of Plaintiff's shoulders on June 21, 2002.  Dr. Michael J. Estner viewed the X-rays and indicated "relatively mild AC joint degenerative changes [were] present bilaterally, slightly more pronounced on the right."  Tr. at 172 (capitalization omitted).  Dr. Braeutigam referred Plaintiff to Dr. Carlos L. Esquivia-Munoz, who recommended an arthrogram study evaluation of the right shoulder.  Tr. at 285.  On August 1, 2002, Dr. Esquivia-Munoz diagnosed Plaintiff with a tear of the right rotator cuff.  Tr. at 284.  Dr. Esquivia-Munoz recognized the possibility of arthrotomy and video arthroscopic surgery of the right shoulder; however, he recommended Plaintiff obtain a second opinion because he could not guarantee Plaintiff would be completely free of pain and able to participate in sports activities after such procedures.  Id.  Dr. Esquivia-Munoz sent Plaintiff back to Dr. Braeutigam to obtain a second opinion.  Id.  Plaintiff testified that surgery was performed on his shoulder.  Tr. at 319.

### 2.  Plaintiff's Right Knee

On November 30, 2004, Plaintiff complained to Dr. Braeutigam of pain in his right knee.  Tr. at 134, 133.  Dr. Braeutigam referred Plaintiff to Dr. Patrick M. Hutton.  Tr. at 200-01.  At an appointment on December 10, 2004, Plaintiff told Dr. Hutton he had suffered from knee pain for years.  Id.[4]  Upon review of X-rays and an MRI of Plaintiff's right knee, Dr. Hutton indicated there was a "degenerative tear of the right medial meniscus with a horizontal cleavage component."  Id.  Dr. Hutton recommended arthroscopic surgery.  Id.

---

[4]  The record reflects that on December 4, 2001, Plaintiff complained of knee pain to Dr. Braeutigam.  Tr. at 140, 316.

On December 21, 2004, Dr. Hutton prescribed Plaintiff Vicodin. Tr. at 199. On January 6, 2005, Dr. Hutton saw Plaintiff again in preparation for surgery. Id.

On January 7, 2005, Dr. Hutton performed arthroscopic debridement (chondroplasty) and arthroscopic partial medial meniscectomy of Plaintiff's right knee. Tr. at 204-06. Plaintiff "tolerated the procedure well." Tr. at 206

On January 18, 2005, Plaintiff had a follow-up visit with Dr. Hutton. Tr. at 199. Dr. Hutton indicated Plaintiff had suffered from "severe patellofemoral and lateral degenerative joint disease." Tr. at 199. In the impression section of his treatment notes, Dr. Hutton indicated there was "severe degenerative joint disease [in the] right knee post arthroscopic debridement and partial medial meniscectomy." Id. (capitalization omitted). Dr. Hutton's plan for Plaintiff was to "continue activity as tolerated" and for Plaintiff to remain out of work. Id. Dr. Hutton also discussed Plaintiff's work activity and opined that going up and down ladders for prolonged periods of time "probably is not something he is likely to be able to return to given the physical demands of his job." Tr. at 197.

On February 18, 2005, Plaintiff saw Dr. Hutton for another follow-up appointment. Tr. at 197. Plaintiff was "about back to his preoperative status," but he could not squat or kneel, which Dr. Hutton did not expect him to be able to do so soon after surgery. Id. Dr. Hutton indicated Plaintiff had "degenerative joint disease [in the] right knee post arthroscopic debridement." The plan was for Plaintiff to continue physical therapy, remain out of work, and return for another appointment in a month. Id. (capitalization omitted).

On March 22, 2005, Plaintiff returned to Dr. Hutton for a follow-up appointment. Tr. at 196-97. Plaintiff had improved with day-to-day activity and was having less pain, but he

was still unable to squat or kneel.  Tr. at 196.  Plaintiff had a full range of movement in his knee with no effusion, stability was good, and Plaintiff's "skin and neurovascular [were] intact."  Id.  There was still some slight, generally diffuse tenderness over the medial aspect of the knee.  Id.  Dr. Hutton allowed Plaintiff "to return to light duty at work."  Id.

On April 4, 2005, Plaintiff was given a refill of Darvocet.  Tr. at 196.  On April 15, 2005, Plaintiff saw Dr. Hutton for a follow-up appointment.  Id.  Plaintiff was "continuing to have problems with his knees with kneeling or squatting[;] his work requires climbing ladders, climbing poles with hooks, etc.[,] and he is not really capable of that at the present time."  Id. Dr. Hutton opined that it was unlikely Plaintiff would ever be able to engage in those activities again given the degenerative changes in his knee.  Tr. at 196-95.  Plaintiff reported he was beginning to experience pain in the posterior aspect of his left knee and left calf.  Tr. at 195. Dr. Hutton indicated Plaintiff's "light duty restrictions currently in place at work to avoid prolonged standing or walking, climbing ladders, utility poles, etc. should be made permanent. [Plaintiff] has been encouraged to continue activity as tolerated, continue a home exercise program and start a Glucosamine regimen for at least [three] months."  Id.  Plaintiff was instructed to return to see Dr. Hutton on a "PRN" (as needed) basis and discharged from care.  Id.

### 3.  Plaintiff's Left Knee

On May 5, 2005, Plaintiff complained to Dr. Braeutigam of left knee pain.  Tr. at 132. An MRI was performed on May 11, 2005.  Tr. at 151.  Dr. Gregory C. Wynn found that the "menisci show no area of abnormal signal[,] which is suspicious for a tear. . . ."  Id.  Dr. Wynn concluded it was a "normal examination."  Id.  Dr. Hutton agreed the MRI was normal, but

he indicated there was "probable chrondomalacia patella left knee." Tr. at 192 (capitalization omitted). The plan was for Plaintiff to continue activity as tolerated, continue the Glucosamine that was recommended for his right knee, continue a home exercise program for both knees, and see Dr. Hutton on an as needed basis. Id.

On November 1, 2005, Plaintiff saw Dr. Hutton again for treatment of his left knee. Tr. at 191. Clinical examination confirmed crepitus. Id. Flexion and extension of the knee were painful, and there was pain with patellofemoral compression. Id. Plaintiff's skin and neurovascular were intact. Id. Dr. Hutton indicated there was chrondomalacia patellae in the left knee. Id. Plaintiff decided to proceed with arthroscopic surgery, as he "felt he had sufficient benefit from his right knee surgery to warrant that." Id.

On November 29, 2005, Plaintiff saw Dr. Hutton in preparation for surgery. Tr. at 187. On December 5, 2005, Plaintiff underwent arthroscopic debridement (chrondoplasty) and arthroscopic lateral release of his left knee. Tr. at 186, 251-53. Plaintiff "tolerated the procedure well." Tr. at 253.

On December 12, 2005, Plaintiff saw Dr. Hutton for a follow-up appointment. Tr. at 185. The moderate effusion in Plaintiff's left knee was "a little bit too much" to consider putting Plaintiff in a patellar-stabilizing brace. Id. The plan was to start Plaintiff on a physical therapy program and have Plaintiff return to see Dr. Hutton in seven to ten days. Id.

On December 19, 2005, Plaintiff had an initial evaluation at Heartland Rehabilitation Services. Tr. at 274. Plaintiff complained of a forty percent loss of function and reported sharp knee pain with a rating of six out of ten with medication. Id. It was indicated that Plaintiff's rehabilitation potential was good, and that Plaintiff "would benefit from skilled

physical therapy to address physical deficits and to return [him] to a prior level of function." Tr. at 275. The plan was for Plaintiff to have physical therapy three times a week for four weeks. Id.

On December 22, 2005, Plaintiff saw Dr. Hutton for another follow-up appointment. Tr. at 184. There was still significant swelling, but the wounds appeared to have healed well. Id. There was no evidence of infection. Id. "Under aseptic technique an aspiration of 60 cc of serosanguineous fluid was accomplished from the left knee. The knee was then injected with a mixture of Xylocaine, Marcaine and Depo-Medrol and [Plaintiff] was placed in a patellar-stabilizing brace." Id.

On January 5, 2006, Plaintiff saw Dr. Hutton again. Tr. at 183. Plaintiff still had persistent swelling in his knee, which increased with walking or activity. Id. Dr. Hutton indicated Plaintiff had degenerative joint disease in his left knee, post arthroscopic debridement and lateral release. Id. Plaintiff was given a prescription for Vicodin, and he was directed to continue with physical therapy and remain out of work. Id.

On February 7, 2006, Plaintiff had another follow-up appointment with Dr. Hutton. Tr. at 182. Plaintiff had significant pain in both knees. Id. Dr. Hutton indicated Plaintiff had "degenerative joint disease, bilateral knees." Id. (capitalization omitted). Dr. Hutton instructed Plaintiff to continue activity as tolerated. Id. It was noted that physical therapy seemed to aggravate his knee pain, so Plaintiff was to continue a home exercise regimen. Id. Dr. Hutton indicated Plaintiff was "probably a candidate for total knee arthroplasty in the near future." Id.

On February 21, 2006, Plaintiff was discharged from Heartland Rehabilitation Services. Tr. at 270. Plaintiff had attended fifteen of sixteen physical therapy sessions and had met ninety to ninety-five percent of therapy goals. Id. Although Plaintiff had pain in his left knee around the knee cap, he was able to complete physical therapy activities without an increase in pain. Tr. at 272.

On March 3, 2006, Plaintiff saw Dr. Hutton again. Tr. at 181. Plaintiff was improving with the home exercise program and activity modification. Id. Plaintiff still had pain in both knees "as would be expected." Id. Dr. Hutton noted Plaintiff's bilateral degenerative joint disease of the knees. Id. The plan was for Plaintiff to continue a home exercise program and to return to Dr. Hutton on an as needed basis. Id.

Four months later, on June 15, 2006, Plaintiff returned to Dr. Hutton for treatment of increased pain and swelling in his left knee. Tr. at 180. Clinical examination revealed moderate effusion with some limitation of motion and pain with mensical grind. Id. "Under aseptic technique his knee was aspirated of 50 cc of synovial fluid. It was then injected with a mixture of Xylocaine, marcaine and Depo-Medrol with good initial relief of symptoms." Id. Plaintiff was directed to continue activity as tolerated and to return to see Dr. Hutton as needed. Id.

Nine months later, on March 29, 2007, Plaintiff returned to Dr. Hutton. Tr. at 278. Plaintiff complained of ongoing problems with his knees. Id. Plaintiff reported he could not squat without pain or walk more than a quarter of a mile without pain; going up and down stairs increased his pain. Id. Plaintiff had swelling in his knees and occasionally had instability and stiffness in his knees after he had been sitting for a prolonged period of time.

Id. Plaintiff also had a "catching sensation" at times and had a feeling of instability after prolonged or increased activity. Id. Physical examination revealed a range of motion from five to 120 degrees. Id. There was no effusion. Id. "There [was] tenderness and crepitus with patellofemoral compression, also tenderness over the anterior medial femoral condyle. Ligamentously [Plaintiff was] stable. Skin and neurovascular [were] intact." Id. X-rays showed "evidence of patellofemoral degenerative joint disease with osteophyte formation on both the trochlear and patellar sides and there is beaking of the tibial spines." Id. Plaintiff had "severe degenerative joint disease with delamination of the articular cartilage, most noted in the trochlea of both femurs but also noted on the patella of both knees and on the lateral femoral condyle of the right knee. There [was] also softening of the articular cartilage throughout." Id. In the impression section of his treatment notes, Dr. Hutton indicated Plaintiff had bilateral severe degenerative joint disease of the knees. Id. The plan was for Plaintiff to continue activity as tolerated and to return to see Dr. Hutton as needed. Id.[5]

## B. The ALJ's Decision

The ALJ performed the required five-step sequential inquiry set forth in 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). See Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). At step one, the ALJ established Plaintiff had not engaged in substantial gainful activity since June 1, 2005 (the alleged onset date). Tr. at 14. At step two, the ALJ found Plaintiff suffered from degenerative joint disease, a severe impairment. Id. At step three,

---

[5] On two other occasions, Plaintiff reported knee pain to Dr. Braeutigam. On January 31, 2007, Plaintiff complained of knee pain during a wellness exam. Tr. at 123. On April 10, 2007, Plaintiff again complained of knee pain to Dr. Braeutigam. Tr. at 289. In the treatment notes for both office visits, Dr. Braeutigam prescribed or indicated Plaintiff was taking hydrocodone; however, it does not appear Dr. Baeutigam ordered any other additional treatment for Plaintiff's knee pain. Tr. at 123, 289.

the ALJ stated Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. Tr. at 19. The ALJ determined Plaintiff had the residual functional capacity to perform a range of light work activity. Tr. at 20. At step four, the ALJ observed that Plaintiff was unable to perform any past relevant work. Tr. at 22. However, the ALJ established at step five that jobs exist in significant numbers in the national economy Plaintiff could perform, considering his age, education, work experience, and residual functional capacity. Tr. at 23. The ALJ explained the transferability of Plaintiff's job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled regardless of transferable job skills. Id. Nonetheless, the ALJ noted Plaintiff "does have the following transferrable skills: knowledge of wiring, circuitry, and electronics; record keeping or keeping of service records; basic communication and communication with dispatch or supervisors, similar to other types of utilities maintenance dispatching and service communication." Id. The ALJ concluded Plaintiff had not been under a disability[6] from June 1, 2005 (the alleged onset date) through the date of the decision. Tr. at 24.

### III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty

---

[6] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).

v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). It is not for this Court to reweigh the evidence; rather, this Court reviews the entire record to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

## IV. Discussion

Plaintiff challenges the ALJ's decision on three grounds. First, Plaintiff contends the ALJ incorrectly weighed the medical opinions of Plaintiff's treating physicians, Dr. Braeutigam and Dr. Hutton; in particular, Plaintiff contends the ALJ erred by failing to give Dr. Braeutigam's opinion "great" weight. Plaintiff's Memorandum at 7. Second, Plaintiff asserts the ALJ incorrectly determined Plaintiff residual functional capacity. Plaintiff's Memorandum at 7-8. Third, Plaintiff argues the ALJ incorrectly assigned the burden of proof

at step five of the sequential evaluation process. Plaintiff's Memorandum at 8-9. These issues are addressed in turn.

## A. Weight Given to Medical Opinions of Treating Physicians

The Social Security Administration has promulgated regulations instructing ALJs how to weigh the medical opinions[7] of treating physicians[8] properly. <u>See</u> 20 C.F.R. § 404.1527(d). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering factors such as the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician. <u>Id.</u>

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).

---

[7] Medical opinions are statements from physicians that reflect judgments about the nature and severity of the claimant's impairment, including symptoms, diagnosis, prognosis, and what the claimant can still do despite the impairment. 20 C.F.R. § 404.1527(a)(2).

[8] A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required the for the medical condition. <u>See</u> 20 C.F.R. § 404.1502.

Good cause exists when (1) the opinion is not bolstered by the evidence, (2) the evidence supports a contrary finding, or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records.  Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004); see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).  The ALJ must "state with particularity the weight he [or she] gave the different medical opinions and the reasons therefor."  Sharfarz v. Bowen, 825 F.2d 278, 279-80 (11th Cir. 1987); see also MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

Plaintiff contends the ALJ should have given great weight to Dr. Braeutigam's opinion. Plaintiff's Memorandum at 6-7.  As noted above, Dr. Braeutigam treated Plaintiff for a variety of routine medical problems since 1996.  Tr. at 121-50.  Dr. Braeutigam completed a Medical Assessment of Ability to Do Work Related Activities form ("Assessment") on April 10, 2007. Tr. at 279-83.  In the Assessment, Dr. Braeutigam opined Plaintiff could frequently lift up to twenty pounds and occasionally lift up to fifty pounds, and Plaintiff could frequently carry up to ten pounds and occasionally carry up to fifty pounds.  Tr. at 279.  Dr. Braeutigam noted there was an increase in pain with an increase in weight.  Tr. at 280.  Dr. Braeutigam further opined that in an eight-hour workday, Plaintiff could sit a total of eight hours, stand a total of three hours, and walk a total of one hour.  Id.  Dr. Braeutigam indicated Plaintiff's hands were not affected by his medical condition.  Tr. at 281.  According to Dr. Braeutigam, Plaintiff could never climb, crouch, kneel, or crawl, but he could occasionally balance or stoop.  Id.

Dr. Braeutigam further explained that Plaintiff had dull to sharp pain in both knees on a daily basis precipitated by increased activity, such as walking, and the pain was severe enough to require narcotics. Tr. at 282. Dr. Braeutigam opined that Plaintiff's pain and other symptoms interfered with his concentration frequently, that Plaintiff would need to be able to shift positions at will, and that Plaintiff would have to take unscheduled breaks during an eight-hour day. Id. Dr. Braeutigam also noted Plaintiff would have to avoid extreme temperatures and avoid damp or cold weather. Id. Dr. Braeutigam estimated Plaintiff could be expected to miss more than seven days of work per month. Id. The Assessment was retrospective back to November of 2004 and indicated Plaintiff's condition could be expected to last at least twelve months. Tr. at 283. Dr. Braeutigam made reference to X-rays that supported his Assessment. Tr. at 280.[9]

The ALJ accepted almost all of the limitations noted in Dr. Braeutigam's Assessment. In fact, the ALJ used lifting and carrying restrictions that were more limiting than those described by Dr. Braeutigam. Tr. at 19-20, 21-22. According to Dr. Braeutigam's Assessment, Plaintiff was able to lift and carry up to fifty pounds occasionally; the ALJ, on the other hand, found Plaintiff was able to lift and carry up to only twenty pounds occasionally. Tr. 279-80; 19-20, 21-22. The ALJ rejected just two aspects of Dr. Braeutigam's Assessment: (1) pain would frequently interfere with Plaintiff's attention and

---

[9] Dr. Braeutigam also mentioned Plaintiff's anxiety in the Assessment. Tr. at 282. Although Plaintiff testified he had been prescribed Ativan and Lexapro, he stated he did not take "much of it." Tr. at 326. Dr. Braeutigam did not refer Plaintiff to a specialist for his anxiety. Tr. at 330. Plaintiff did seek treatment for his anxiety from a specialist on one occasion, but he could not remember the name of the person who treated him and was told his feelings were "justified," or normal. Tr. at 326-27. Plaintiff never went back for further treatment, Tr. at 327, and there are no records of this treatment. The ALJ found Plaintiff's anxiety was not a severe impairment. Tr. at 14-15. Plaintiff raises no issues with respect to his anxiety. See Plaintiff's Memorandum.

concentration; and (2) Plaintiff would have more than seven absences from work per month. Tr. at 22.

The ALJ clearly articulated reasons showing good cause for discounting these two aspects of Dr. Braeutigam's Assessment:

> [T]hese two opinions are not supported by thorough, contemporaneous treatment notes, and are not consistent with the objective medical evidence of record. The lack of significant objective findings in diagnostic testings of record, evaluations from Dr. Braeutigam, and other evaluations of record, convinces me that the above-discussed opinions rendered by Dr. Braeutigam are entitled to little weight. . . . Summarily, the medical evidence is clearly not compatible with evidence one would expect of someone who is totally and completely disabled.

Tr. at 22.

These reasons are supported by substantial evidence. Notably, Plaintiff does not provide any citation to treatment notes, objective medical findings, or evaluations in the record that contradict the ALJ's reasons for discounting Dr. Braeutigam's opinion. The record shows Dr. Braeutigam's treatment of Plaintiff's shoulder and knee pain was limited and sporadic. Between 2001 and 2007, Plaintiff complained to Dr. Braeutigam of bilateral shoulder pain once–on June 20, 2002. Tr. at 138.[10] During those same six years, Plaintiff complained to Dr. Braeutigam of knee pain on only five occasions, twice of which were during physical or wellness exams. Tr. at 140, 133-34, 132, 131, and 123. Dr. Braeutigam did little more than note Plaintiff's subjective complaints on these occasions. Although Dr. Braeutigam did order X-rays and MRIs at times, he consistently referred Plaintiff to Dr.

---

[10] It appears an X-ray of Plaintiff's shoulder was ordered on December 4, 2001, but shoulder pain is not listed as one of Plaintiff's chief complaints. Tr. at 140.

Hutton for treatment. Dr. Braeutigam's treatment notes reflect that he made no explicit findings with respect to Plaintiff's knee complaints prior to the Assessment in April of 2007.

In contrast to Dr. Braeutigam's opinion, the ALJ found Dr. Hutton's treatment notes did not support a finding of disability. The ALJ emphasized that she credited Dr. Hutton's findings and gave them "significant" weight. Tr. at 22. As the ALJ explained, Dr. Hutton is a specialist in orthopedics who treated Plaintiff for the very condition Plaintiff claims prevents him from being able to work. Id. Whether the treating physician is a specialist in the relevant area is an appropriate consideration. See 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5).

Dr. Hutton did not complete a Medical Assessment of Ability to Do Work Related Activities form. Nonetheless, the ALJ determined Dr. Hutton allowed Plaintiff to return to "light duty at work"[11] in March of 2005, Tr. at 196, and there was no evidence this medical advice subsequently changed. Tr. at 22. The Commissioner points out that in April of 2005, Dr. Hutton made permanent Plaintiff's light duty restrictions to avoid prolonged standing or walking and not to climb ladders or utility poles. See Memorandum in Support of the Commissioner's Decision (Doc. No. 16) at 7; Tr. at 195. In his Memorandum, Plaintiff acknowledges that in April of 2005 Dr. Hutton "simply state[d] that [P]laintiff should avoid prolonged standing and walking [and that] . . . . [n]o other opinions were rendered after the left knee surgery." Plaintiff's Memorandum at 6; Tr. at 195. On January 5, 2006, following surgery, Dr. Hutton did direct Plaintiff to remain out of work. Tr. at 183. However, this restriction was not imposed at Plaintiff's next follow-up visit on February 7, 2006, when

_____

[11] The undersigned does not assume that Dr. Hutton used the term "light work" with an understanding of the Social Security Administration's definition of that term. Rather, Dr. Hutton's statement simply reflects his opinion that Plaintiff was capable of engaging in some form of substantial gainful activity.

Plaintiff was advised to continue activity as tolerated. Tr. at 182. Thereafter, on March 3, 2006, Plaintiff was advised to continue a home exercise program. Tr. at 181. Most recently, on March 29, 2007, Dr. Hutton noted Plaintiff was unemployed but did not suggest he was totally unable to work; the plan was for Plaintiff to continue activity as tolerated and to return to Dr. Hutton as needed. Tr. at 278.

The ALJ noted other aspects of the record that are contrary to Dr. Braeutigam's Assessment and a finding of disability. The ALJ stated that Plaintiff's activities of daily living do not support a finding of total inability to work. Tr. at 21. Plaintiff was able to care for his personal needs, go to the grocery store, run errands, occasionally wash dishes and take out the trash, use a riding lawn mower to do yard work, and drive. Tr. at 323-24. Plaintiff testified that on an average day he sat three to five hours, he stood for "a couple" of hours, and he walked for an hour to an hour and a half. Tr. at 329. Plaintiff also testified that he went up and down a flight of stairs two or three times a day, although with some difficulty. Tr. at 328.

In addition, portions of Plaintiff's history and testimony are inconsistent with Dr. Braeutigam's opinion. Plaintiff went on a three-day cruise in February of 2007. Tr. at 324. He testified he sometimes did not need to take any pain medication. Tr. at 325. When Plaintiff discontinued physical therapy, he had met ninety to ninety-five percent of the treatment goals. Tr. at 270. Plaintiff told Dr. Hutton that the surgery on his right knee had been beneficial, Tr. at 191, and Plaintiff declined to pursue total knee replacement surgery, as Dr. Hutton contemplated at one point. Tr. at 182, 320-21. When the ALJ asked Plaintiff

why he could not sit behind a desk or table and perform duties that would not require squatting, kneeling, climbing, or crouching, Plaintiff responded:

> I don't know exactly what I would do if I did that. And if I did, if I sit, sitting is almost like walking for long periods. If I sit I need, I have to get up periodically and then my knees lock up on me. It's–they just, I don't know. I don't know what I would do to begin with . . . to be honest with you. I've never done anything but work outside and I can't really give you a particular reason other than I'm just in pain most of the time at some point during the day.

Tr. at 318. Plaintiff's own statement does not reflect the limitations one would expect of a person who is not capable of engaging in any substantial gainful activity. Furthermore, the ALJ noted the opinions of the Dr. Nicholas H. Bancks, Tr. at 254-61, and Dr. Reuben E. Brigett, Tr. at 262-69, the State Agency medical experts who reviewed Plaintiff's medical records, were in accord with the objective medical evidence and did not support a finding of disability. Tr. at 22.

The ALJ clearly articulated reasons showing good cause for discounting Dr. Braeutigam's medical opinion, see Phillips, 357 F.3d at 1240-41; Edwards, 937 F.2d at 583-84 , and there is "such evidence as a reasonable mind might accept as adequate to support" those reasons. Falge, 150 F.3d at 1322. Accordingly, the ALJ properly weighed Dr. Braeutigam's and Dr. Hutton's medical opinions, and the ALJ's findings are supported by substantial evidence.

### B. Plaintiff's Residual Functional Capacity

After considering all of Plaintiff's symptoms and the extent to which those symptoms could be reasonably accepted as consistent with the evidence, the ALJ made clear, thorough findings with respect to Plaintiff's residual functional capacity. Tr. at 19-20. The ALJ

determined Plaintiff had the residual functional capacity to engage in the following activities: lifting and/or carrying up to twenty pounds occasionally and ten pounds frequently; pushing and/or pulling over twenty pounds; standing for three hours, walking for one hour, and sitting up to eight hours in an eight-hour workday. Tr. at 19. The ALJ found Plaintiff had no limitations in the use of his hands. Id. In addition, the ALJ recognized Plaintiff could occasionally balance and stoop, but he could never crouch, crawl, kneel, climb, or squat. Id. The ALJ noted Plaintiff would require the ability to shift from sitting, standing, and walking at will. Tr. at 19-20. Based on these findings, the ALJ concluded Plaintiff could "perform a range of light work activity." Tr. at 20.

Plaintiff contends there is no indication Plaintiff could walk and stand more than four hours per day,[12] and therefore the ALJ should have found that Plaintiff retained the residual functional capacity to perform only sedentary jobs rather than some light duty jobs. See Plaintiff's Memorandum at 7. Plaintiff argues that if Plaintiff's residual functional capacity were categorized as exclusively sedentary, then two of the four jobs identified by the vocational expert would be eliminated, and the occupational base would be further eroded by Plaintiff's alleged need for unscheduled breaks. See id. Therefore, Plaintiff requests remand "for clarification of the specific limitations that were accepted." See id. at 8.

The social security regulations explain the difference between light work and sedentary work as follows:

---

[12] Although Plaintiff claims there is no indication Plaintiff retained the ability to walk and stand in excess of four hours per day, notably Dr. Braeutigam, on whose opinion Plaintiff insists the ALJ should have relied, indicated in the Assessment that Plaintiff could stand for three hours and walk for one hour in an eight-hour work day. Tr. at 280.

(a) Sedentary work.  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) Light work.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. . . .

20 C.F.R. §§ 404.1567 and 416.967.  The full range of "[l]ight work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  Freeman v. Barnhart, 220 F. App'x 957, 960 (11th Cir. 2007) (unpublished) (quoting SSR 83-10, 1983 WL 31251, *6 (emphasis added)).[13]

The ALJ concluded Plaintiff had the residual functional capacity "to perform a range of light work activity," Tr. at 20, not the full range of light work.  It appears the ALJ was careful to express Plaintiff's exertional level in this manner because "particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level."  SSR 96-8p, 1996 WL 374184, *3; see also Freeman, 220 F. App'x at 960.  "[I]n order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required at that level."  Id. (emphasis added).  Thus, the ALJ's expression of Plaintiff's exertional level accurately described his residual

---

[13] "Full Range of Work" means all or substantially all occupations existing at an exertional level. SSR 83-10, 1983 WL 31251 at *6.

functional capacity, as determined on a function-by-function basis, and recognized Plaintiff could perform some, but not all, occupations at the light work level.

The ALJ's hypothetical to the vocational expert explicitly incorporated the functional limitations found by the ALJ, as the ALJ directed the vocational expert to presume that Plaintiff had the limitations listed above. Tr. at 334-35. Taking these limitations into account, the vocational expert identified four occupations that exist in significant numbers in the national economy Plaintiff could perform: two of the occupations consisted of sedentary work, and the other two consisted of light work. Tr. at 335-36. The two light work occupations identified by the vocational expert involved "bench work," which would allow Plaintiff to stand or sit on an elevated stool at a bench slightly below chest level assembling electrical meters and gauges, thus accommodating Plaintiff's prolonged sitting and prolonged standing limitations. Tr. at 336-37, 343. Plaintiff does not challenge the accuracy of the vocational expert's testimony. See Plaintiff's Memorandum at 7-8.

Even if the ALJ incorrectly categorized Plaintiff's residual functional capacity, the vocational expert still identified two dispatcher jobs at the sedentary level that Plaintiff can perform. Tr. at 334, 338-39. At the hearing, the ALJ discussed with the vocational expert these different occupations in light of Plaintiff's limitations, Tr. at 333-38, 342-43, and the ALJ explained, "I'm not going to go into a second hypothetical because you've provided me with two jobs in a light range and two jobs in a sedentary range." Tr. at 336. The sedentary jobs identified by the vocational expert would allow five-minute breaks three or four times per day,

which would accommodate the need for unscheduled breaks indicated in Dr. Braeutigam's Assessment.[14]  Tr. at 335.

Given the ALJ's function-by-function findings with respect to Plaintiff's physical capabilities and the testimony of the vocational expert, there is no reason to remand for additional clarification as Plaintiff requests.  The ALJ clearly set out her findings as to Plaintiff's residual functional capacity and explicitly detailed Plaintiff's limitations; based on these limitations, the ALJ identified jobs that exist in significant numbers in the national economy that Plaintiff can perform.  Tr. at 333-38, 342-43.  Therefore, the undersigned declines to remand for additional clarification of Plaintiff's residual functional capacity.

### C.  Burden of Proof at the Fifth Step of the Sequential Evaluation Process

Plaintiff argues the ALJ "incorrectly stated that the Social Security Administration has a limited burden of going forward with evidence" at the fifth step of the sequential evaluation process.  Plaintiff's Memorandum at 8 (emphasis in original).  According to Plaintiff, "[t]his is an incorrect statement of the law in that the Social Security Administration has the burden of showing the existence of alternative job titles that the Plaintiff could perform given his medical history, vocational history, education and age and the claimant bears no burden of proof at this stage of the evaluation."  Plaintiff's Memorandum at 9.  Specifically, Plaintiff objects to the ALJ's following statement of the law:

> At the last step of the sequential evaluation process (20 C.F.R. 404.1520(g) and 416.920(g)), I must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience.  If the claimant is able to do other work, he is not disabled.  If the

_____

[14]  The ALJ did not discount this portion of Dr. Braeutigam's Assessment.

claimant is not able to do other work and meets the duration requirement, he is disabled. <u>Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration.</u> In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 C.F.R. 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

Tr. at 14 (emphasis added).

"An individual who files an application for Social Security disability benefits must prove that she is disabled." <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999); <u>see also</u> 20 C.F.R §§ 404.1512(a) and 416.912(a) (providing that claimants generally have the burden of proving disability). The United States Court of Appeals for the Eleventh Circuit has made clear that claimants bear the burden of proof for the first four steps of the sequential evaluation process. <u>See</u> <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 (11th Cir. 2001); <u>see also</u> <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1241 n.10 (11th Cir. 2004); <u>Maffia v. Commissioner of Social Security</u>, 291 F. App'x 261, 263 (11th Cir. 2008) (unpublished) (stating that "[o]nly at the fifth step does the burden shift to the Commissioner, who must demonstrate the existence of a significant number of jobs in the national economy that the claimant can perform"). The Eleventh Circuit has explained the shifting burden at step five of the sequential evaluation process as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The

temporary shifting of the burden was initiated by the courts, and is not specifically provided for in the statutes or regulations.

Doughty, 245 F.3d at 1278 n.2 (citations omitted).

Although the ALJ's statement of the law may be open to more than one interpretation, the undersigned is convinced the ALJ applied the correct legal standard. Plaintiff recognizes that the ALJ "did, in fact, produce suitable alternative employment" through the testimony of the vocational expert. Plaintiff's Memorandum at 9. Plaintiff's argument raises what is "merely a question of semantics." Rivera v. Astrue, No. 3:07-cv-562-J-TEM, 2008 WL 4456750, at *5 (M.D. Fla. Sept. 30, 2008) (rejecting the identical argument). It is evident that the ALJ correctly assigned the burden at the fifth step because she obtained testimony from a vocational expert showing work is available that Plaintiff would be able to perform.

## V. Conclusion

Substantial evidence supports the ALJ's decision that Plaintiff was not disabled. The ALJ properly weighed the medical opinions of Plaintiff's treating physicians and clearly articulated reasons supported by substantial evidence showing good cause for discounting the opinion of Dr. Braeutigam. In addition, the ALJ's findings with respect to Plaintiff's residual functional capacity were clear and supported by substantial evidence. Furthermore, the ALJ applied the correct legal standards. In accordance with the foregoing, it is

**ORDERED:**

1.      The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) as incorporated by 42 U.S.C. § 1383(c)(3) **AFFIRMING** the Commissioner's decision.

2.      The Clerk of Court is directed to close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 2nd day of March, 2009.

*James R. Klindt*

**JAMES R. KLINDT**
United States Magistrate Judge

jdf

Copies to:

Counsel of Record